WESTINGHOUSE, CHURCH, KERR & CO. v. REMINGTON SALT CO.

(Supreme Court, Appellate Division, Third Department.  November 20, 1906.)

1. REFORMATION OF INSTRUMENTS—GROUNDS FOR REFORMATION—MUTUALITY OF MISTAKE.

Plaintiff installed in the salt plant of defendant, stokers and a smokeless furnace equipment under a contract guarantying the stokers to be capable of burning sufficient rice anthracite coal which would pass through a three-eighths inch mesh and over a three-sixteenths inch mesh to develope the full horse-power of the boiler.  Defendant, after plaintiff's performance, sought to reform the contract on the ground of mistake in the description of the coal, and averred that the parties intended to otherwise describe the coal.  Neither plaintiff nor defendant intended that the guaranty should rest on coal of any size except that which they expressly stated in the contract.  The mistake complained of consisted in the erroneous assumption of both parties that the rice anthracite coal supplied by a company at a place and vicinity answered the description stated in the contract.  *Held*, that defendant was not entitled to reformation.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 42, Reformation of Instruments, §§ 71, 72.]

2. BREACH—DAMAGES.

Plaintiff installing in the salt plant of defendant, stokers and a smokeless furnace equipment sued for services rendered in instructing defendant's employés, and defendant set up a counterclaim for breach of warranty.  *Held*, that an instruction that if the stokers were worthless for the purpose for which they were furnished because they would not burn bituminous coal without smoke, as warranted, defendant was entitled to recover back the purchase price with the special damages sustained, was erroneous because authorizing a verdict for defendant for special damages and the purchase price, though the stokers might have a market value generally.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, §§ 1285, 1286.]

Kellogg, J., dissenting.

Appeal from Trial Term, Tompkins County.

Action by Westinghouse, Church, Kerr & Co. against the Remington Salt Company.  From an interlocutory judgment dismissing an equitable counterclaim for the reformation of a contract because of a mutual mistake, and from an order setting aside a verdict of $3,741 on a counterclaim in favor of defendant, it appeals.  Affirmed.

These appeals, although separately taken, were argued together and on the same record, and present different phases of the same litigation.  The plaintiff furnished and installed for the defendant for use in its salt plant and power station near Ithaca, N. Y., a certain Roney mechanical stoker and smokeless furnace equipment, with appliances and appurtenances, for the price of $3,638, which has been paid by the defendant.  Pursuant to the same contract, plaintiff furnished an engineer to superintend the erection of the stoker and to instruct the firemen of the defendant in the operation of the same, for which the defendant agreed to pay $5 per day for the time of the engineer, in addition to his expenses.  The services and disbursements of the engineer amounted to $201.94, and the purpose of the action is to recover the amount last mentioned.  The contract was in writing and contained the following provision: "We guarantee these stokers to burn bituminous coal without smoke when operated according to directions; and to be capable of burning sufficient good rice anthracite coal to develope the full rated horse-power of the boiler, provided each stoker is supplied with a draft

represented by the difference in water pressure of $\frac{3}{4}$ of an inch above and below the fire. By rice anthracite coal is meant that which will pass through a $\frac{3}{8}$ inch mesh and over a $\frac{3}{16}$ inch mesh."

The counterclaim alleges said contract, and then continues as follows: "That it was the intention of both parties in describing the rice anthracite coal referred to in said instrument to describe the coal supplied by the Lehigh Valley Coal Company then being used in Ithaca and vicinity and known as rice coal, and which had been screened by screens of the meshes used in screening the rice anthracite coal supplied by said coal company to the Ithaca market. But by mistake the words 'that which will pass through a $\frac{3}{8}$" mesh and over a $\frac{3}{16}$" mesh' were inserted in said contract for the purpose of describing such coal, under the erroneous belief and mutual mistake of both parties that the rice anthracite coal supplied to the Ithaca market by the Lehigh Valley Coal Company was screened through a $\frac{3}{8}$" mesh and over a $\frac{3}{16}$" mesh. Whereas, in fact, the maximum mesh through which rice anthracite coal furnished by said company was screened was a $\frac{11}{32}$" mesh, and the minimum mesh over which the said coal was screened was a $\frac{2}{16}$" mesh; and in so far as said contract described a different mesh, it is erroneous and fails to express the true intent and meaning of the parties. That in order to make the said contract conform to the actual intention of the parties, it is necessary that the said instrument be reformed so that in place of said clause shall be inserted the following, viz: By rice anthracite coal is meant the coal supplied by the Lehigh Valley Coal Company now used in Ithaca and vicinity and known as rice coal, and which has been screened by screens of the meshes used in screening the rice anthracite coal supplied by said coal company to the Ithaca market." Said counterclaim further alleges that defendant relied upon said warranty in the erection and installation of said stoker and furnace equipment; that it was operated by defendant according to the directions of the plaintiff, with the kind of coal and under the conditions contemplated by the contract; that said stoker and furnace equipment failed to burn bituminous coal without smoke, and failed to burn sufficient anthracite coal of the requisite kind and quality to develope the power specified in the contract. The counterclaim further contains allegations of special damages and demands judgment that the said contract be reformed so that in place of the words, "that which will pass through a $\frac{3}{8}$" mesh and over a $\frac{3}{16}$" mesh," in describing rice anthracite coal, there be inserted the words "the coal supplied by the Lehigh Valley Coal Company now used in Ithaca and vicinity and known as 'rice' coal, and which has been screened by screens of the meshes used in screening the rice anthracite coal supplied by said coal company to the Ithaca market"; and judgment is also demanded for the damages which the appellant claimed to have sustained by reason of the breach of warranty.

At the trial, according to the interlocutory judgment appealed from, it was ordered by the justice presiding thereat, counsel for the respective parties consenting thereto, that a jury be impaneled and all of the evidence applicable to the equitable counterclaim should first be presented before the court and jury; that the court would then decide the issues raised by said equitable counterclaim without the aid of the jury, and that thereafter the remaining issues should be tried and submitted to the jury, omitting, however, so much of the evidence applicable to the latter issues as had already been given in the presence of the jury on the former issue, all of which was done; and the court decided on the former issue as a matter of law that defendant had failed to make a case on its equitable counterclaim for the reformation of the contract upon which this action is brought. Pursuant to said arrangement under which the action was tried, an interlocutory judgment was entered dismissing said equitable counterclaim. The trial proceeded before the court and jury as to the remaining issues, and resulted in a verdict in favor of the defendant on its counterclaim for the amount before stated, which verdict was set aside by the trial justice and a new trial granted. The defendant was limited by the court to a recovery only for a breach of the warranty in reference to the use of bituminous coal without smoke, and did not recover for breach of warranty

concerning that part of the contract sought to be reformed. The appellant appeals both from said interlocutory judgment and from said order setting aside the verdict.

Argued before PARKER, P. J., and SMITH, CHESTER, KELLOGG, and COCHRANE, JJ.

Myron N. Tompkins and J. H. Jennings, for appellant.

Dill & Baldwin (Arthur J. Baldwin and Edward T. Magoffin, of counsel), for respondent.

COCHRANE, J. The parties clearly and unequivocally stated in their contract that "by rice anthracite coal is meant that which will pass through a $\frac{3}{8}$" mesh and over a $^3/_{16}$" mesh." There could be no mistake as to the size of the coal which they intended to describe. They expressly stated their meaning. And it was on coal of this particular size that the guaranty in question was based. It appears uncontroverted from the evidence that the size of the coal is a material element in the successful operation of these stokers. Non constat, the plaintiff would not have made such a guaranty based on coal of a different size. The mistake complained of does not consist in the erroneous formulation of the contract, but in the erroneous assumption by both parties that the rice anthracite coal supplied by the Lehigh Valley Coal Company in Ithaca and vicinity answered the description stated in the contract. This perhaps may more appropriately be characterized as mutual ignorance rather than as a mutual mistake. The defendant with considerable circumlocution states in its counterclaim the clause which it wishes to have substituted bodily in the place of the clause in the contract above quoted, and to have the latter clause absolutely eliminated. But to reduce to its simplest terms the proposed substitution of the defendant it means that the description of the size of the meshes shall be changed so that eleven-thirty-seconds shall be substituted for three-eighths and two-sixteenths for three-sixteenths thereby making said clause to read as follows:

"By rice anthracite coal is meant that which will pass through a $^{11}/_{32}$" mesh and over a $^2/_{16}$" mesh."

This would make the plaintiff's guaranty relate to coal of a different size from that which constituted the basis of the guaranty which it in fact made. Neither the plaintiff nor the defendant intended that the guaranty should rest on coal of any size except that which they expressly stated in the contract. The plaintiff in good faith has performed the contract which it made. The defendant, after waiting until full performance by the plaintiff, now seeks to change the contract of guaranty in its very essence, the effect of which change will be to give the defendant a cause of action against the plaintiff for a breach of guaranty based on coal answering a description absolutely inconsistent with the description thereof on which the guaranty was based. If the contract had not been executed, it may be that in equity it should be reformed or rescinded. But the parties are not now in the same position. Reformation cannot now be effected without imposing on plaintiff a much greater liability than if defendant had promptly asked for

redress. It is unfortunate for the defendant that the parties were mutually ignorant of the size of the coal furnished in the vicinity of Ithaca. But the defendant was derelict in not ascertaining that fact when the contract was made, and should not now cast the burden of such dereliction on the plaintiff, which is no more at fault than the defendant. The proposed reformation would simply transfer this misfortune from the defendant to the plaintiff. The reformation of a contract must proceed on principles of equity, and it would not be equitable or just after the plaintiff has performed its contract in good faith to cast on it a burden which it never intended to assume, and which might have been obviated had defendant asked for reformation before performance. Under such circumstances equity requires that the defendant should bear the consequences of its own mistake. The Trial Court, therefore, properly declined to reform the contract.

The verdict in favor of the defendant was properly set aside by the trial justice because of erroneous instructions to the jury concerning the measure of damages. The court charged, "if there was a breach of the contract the plaintiff would not be entitled to recover anything." And again, at the request of defendant's counsel, that, if the jury "find from the evidence that the stokers were worthless for the purpose for which they were furnished by reason of the fact that they would not burn bituminous coal without smoke, then the defendant is entitled to recover back the purchase price, with the special damage sustained by the defendant as shown by the evidence." The plaintiff excepted to those portions of the charge. Under this charge the jury were required to award the defendant a verdict for all of the special damages sustained by it, and in addition thereto for all of the purchase price, provided only the stokers were worthless for the particular purpose for which they were furnished because of not burning bituminous coal without smoke, and regardless of their value in the open market. It is clear that they might be worthless for the defendant's purposes and still have much value in the market generally, but the jury under the charge excepted to was not permitted to take into consideration this latter feature of the case. The rule of damages as given to the jury was widely divergent from the correct rule and clearly misleading.

The interlocutory judgment should be affirmed, without costs, and the order setting aside the verdict should be affirmed, with costs. All concur, except KELLOGG, J., who dissents as to the affirmance of the interlocutory judgment, and PARKER, J., not voting.

JOHN M. KELLOGG, J. (dissenting.) The error in this case is in disposing of it as a matter of law and deciding that there is no evidence tending to show that the written contract does not carry out the verbal understanding of the parties. The evidence tended to show that the plaintiff knew that it was impracticable for defendant at its factory to use any other kind of coal than the Lehigh Valley coal, and the plaintiff tested the Lehigh Valley coal and said the machine would use it successfully, and sold it for such use. Neither party was interested in the abstract question of the size of meshes of certain sieves. Both were interested in the question as to whether this furnace would

do the work it was sold to perform and burn the only kind of coal defendant could use. The plaintiff claimed to have tested this coal, and therefore knew that it could do the work, and it became satisfied that this coal would pass through the meshes mentioned. The defendant made inquiry, and was informed by some one that such meshes were used in screening the Lehigh Valley coal. So we have the situation where both parties were contracting with reference to a particular coal; the defendant asking the plaintiff not to put the machine in unless he knew it would use this coal successfully, and the plaintiff agreeing that it would do so, and each party, when the written contract was formed, relying upon the mistaken information received that this kind of coal would pass through such meshes, erroneously used those terms in the contract. The size of the meshes was mentioned as a convenient way to describe the coal agreed upon. By mistake the description was wrong and did not refer to the coal intended. We do not say that the evidence conclusively proves these facts, but it tends to prove them, and a finding that such was the intent and that it was the understanding that the machine would produce the results with this kind of coal would be warranted. It is true that, if through ignorance parties make a contract just as they intend to make it, the law will ordinarily grant them no relief, because the contract carries out just the intent which they did have and the law cannot make a different contract for them. It is equally true that if parties make a verbal agreement, and, when they come to reduce it to writing, they mutually by mistake or ignorance adopt language which does not carry out the terms of the verbal agreement, so that, in fact, the writing does not relate to what the parties had in mind and agreed upon when they contracted, then the written agreement may be reformed so as to carry out the actual verbal agreement. The rule is well stated in 2 Pomeroy's Equitable Remedies, § 376:

"A court of equity has no power to alter or reform an agreement since that would in reality be making a contract for the parties. It is only the instrument evidencing the agreement that can be reformed."

If the written language relating to the guaranty does not describe what the parties had verbally agreed upon and what they intended to describe, there is a mistake, and the contract does not represent the real intent of the parties. A. offers to sell B. a machine for his factory which will do better work than the machine in the rival factory of C., with which machine both parties are familiar, and he guaranties that it will do such work. In writing out the contract the scrivener asks the name of C.'s machine and some one answers the "Doe" machine. Both parties accept that information as a proper description of C.'s machine and write a guaranty that the machine will do better work than the Doe machine, both believing that they have accurately described C.'s machine. The Doe machine is in fact an antiquated machine, and not used by C. The machine used by C., and in fact intended by both parties to the contract, was the "Roe" machine. Both parties wrote the contract relying upon the erroneous information they had received as to the name of the machine. The writing represents this mistake, and misrepresents the intent and the actual agreement of the parties.

The opinion in this case, if carried to its legitimate end, would seem to indicate that such a contract cannot be reformed because both parties when they wrote the contract intended to have the name "Doe" written therein, although it is conceded that the contract as written does violence to the intent and verbal agreement of the parties. "If, on the other hand, after making an agreement, in the process of reducing it to a written form the instrument, by means of a mistake of law, fails to express the contract which the parties actually entered into, equity will interfere with the appropriate relief, either by way of defense to its enforcement or by cancellation or by reformation, to the same extent as if the failure of the writing to express the real contract was caused by a mistake of fact. In this instance there is no mistake as to the legal import of the contract actually made; but the mistake of law prevents the real contract from being embodied in the written instrument. In short, if a written instrument fails to express the intention which the parties had in making the contract which it purports to contain, equity will grant its relief. * * * Among the ordinary examples of such errors are those as to the legal effect of a description of the subject-matter, and as to the import of technical words and phrases; but the rule is not confined to these instances." 2 Pomeroy's Eq. Jur. (3d Ed.) § 345. "All possible forms of mistakes of fact are embraced within this description; and all particular errors which fall under any of these conditions are mistakes of fact which furnish an occasion for equitable relief." Id. § 654.

The mistake here is not an unnatural one, as the defendant in particular was supposed to know nothing about the size of meshes through which the Lehigh Valley coal was screened. That was a technical subject which he might well be mistaken about, and the plaintiff may well have been mistaken in the size of the meshes by which he tested the Lehigh Valley coal, or the sample he selected for the test might not have been a fair one. Where the written contract uses the letter which the parties adopted to express in it the spirit of their contract, and it is found that the letter does not express the spirit, but means something entirely different than both had in their minds at the time they contracted, there may be a reformation. It is always true that the contract which the parties did intend to make and did agree upon may be substituted in the place of the one which they did not intend to make, and a writing which does not speak the truth in that respect may be made truthful. If both parties intended the guaranty to relate to this particular coal, and intended to describe a mesh which would use it, and by mistake they described the wrong sized mesh, and the guaranty does not cover this coal on account of such mistake, the language used in the writing may be corrected so as to carry out the intent of the parties and to define the coal actually intended and agreed upon.

I favor a reversal of the interlocutory judgment.